CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

DEC 09 2021

JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| DAPHNE K.,[1] | ) | |
|     Plaintiff, | ) | Civil Action No. 4:20-cv-00049 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | By:   Joel C. Hoppe |
| SECURITY, | ) |        United States Magistrate Judge |
|     Defendant. | ) | |

Plaintiff Daphne K. ("Daphne") asks this Court to review the Commissioner of Social Security's final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and the applicable law, I cannot find that substantial evidence supports the Commissioner's denial of benefits. Accordingly, I respectfully recommend that the presiding District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*,

88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100

(1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is

"more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount

of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review

considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir.

1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence

allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434

F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not

binding if it was reached by means of an improper standard or misapplication of the law."

*Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in

"any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20

C.F.R. § 404.1505(a).[2] Social Security ALJs follow a five-step process to determine whether a

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In January 2018, Daphne filed for DIB alleging that she had been disabled by mental impairments and strokes since January 1, 2011. *See* Administrative Record ("R.") 143–44, 157–58. Disability Determination Services ("DDS"), the state agency, denied her claim initially in March 2018, R. 83–90, and upon reconsideration in June 2018, R. 91–102. In July 2019, Daphne appeared with counsel and testified at an administrative hearing before ALJ Suzette Knight. *See* R. 26–47. A vocational expert ("VE") also testified at the hearing. R. 42–46.

ALJ Knight issued an unfavorable decision on August 6, 2019. R. 15–21. She first found that Daphne had not engaged in substantial gainful activity since January 1, 2011, and that she met the Act's insured-status requirements through December 31, 2011.[3] R. 17. At step two, ALJ Knight found that Daphne's hypertension, obesity, depression, and bipolar disorder were medically determinable impairments during this relevant period. *Id.* ALJ Knight found, however, that none of these impairments "significantly limited [Daphne's] ability to perform basic work-

---

[3] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). "To qualify for DIB, [Daphne] must prove that she became disabled prior to the expiration of her insured status." *Johnson*, 434 F.3d at 655–56.

activities" for twelve consecutive months. *Id.* Thus, she concluded that Daphne did not have a

"severe" medically determinable impairment or combination of impairments and was not

"disabled" before her insured status expired on December 31, 2011. *Id.* The Appeals Council

denied Daphne's request for review, R. 1–6, thereby making ALJ Knight's decision the final

decision of the Commissioner denying her DIB claim. R. 1. This appeal followed.

### III. Discussion

Daphne primarily challenges ALJ Knight's failure to consider certain medical evidence.

*See generally* Pl.'s Br. 4–7, ECF No. 16. First, she argues that the ALJ failed to consider the

opinions of two DDS psychologists who "concluded that [Daphne's] depressive and bipolar

disorders were . . . severe" medical impairments, even though they also indicated that the

evidence in Daphne's record as of mid-2018 was not sufficient to "'fully' evaluate" her claim.

*Id.* at 5 (citing R. 87–89, 98–100). Next, Daphne argues that ALJ Knight committed legal error

by disregarding a report by Franklin Russell, Ph.D., which was made after Daphne's DLI, but

nonetheless related back to her pre-DLI condition. *Id.* at 6 (citing R. 249–54 (Nov. 1, 2012)).

Daphne's second argument is persuasive.

"To qualify for DIB, [Daphne] must prove that she became disabled prior to the

expiration of her insured status," *Johnson*, 434 F.3d at 656, on December 31, 2011. ALJ Knight

was required to consider Daphne's "complete medical history," 20 C.F.R. § 404.1512(d)(2),

including any relevant evidence created after her DLI that suggested some link between her

"post-DLI state of health and pre-DLI condition," *Bird*, 699 F.3d at 341. As the person seeking

benefits, Daphne was primarily responsible for producing sufficient evidence so that her record

would be "complete and detailed enough" for the agency to determine the "nature and severity"

of any medical impairment(s) Daphne had before her DLI, whether the impairment(s) met the

Act's twelve-month duration requirement, and, if so, how they impacted her "residual functional

capacity to do work-related physical and mental activities." 20 C.F.R. § 404.1512(a)(2). Here,

ALJ Knight determined that Daphne's hearing-level record contained sufficient evidence to

support the conclusion that Daphne's medical conditions in existence before December 31, 2011,

were not "severe" impairments. *See* R. 20–21 (rejecting DDS psychologists' statements that

Daphne's record contained "insufficient evidence upon which to base an opinion").

The primary issue in this case is whether substantial evidence in the administrative record

supports ALJ Knight's conclusion that Daphne did not have a "severe" medically determinable

impairment on or before her DLI. Under the Social Security Act, "medical conditions alone do

not entitle a claimant disability benefits; '[t]here must be a showing of related functional loss.'"

*Felton-Miller v. Astrue*, 459 F. App'x 226, 229–30 (4th Cir. 2011) (quoting *Gross v. Heckler*,

785 F.2d 1163, 1166 (4th Cir. 1986)). Consistent with this rule, "[t]he severity regulation

requires the claimant to show that [s]he has an 'impairment or combination of impairments [that]

significantly limits' 'the abilities and aptitudes necessary to do most jobs,'" *Bowen v. Yuckert*,

482 U.S. 137, 146 (1987) (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(b) (1986)), such as

following simple instructions, exercising judgment, responding appropriately to other people,

and dealing with changes in a routine work setting, 20 C.F.R. § 404.1522(b)(3)–(6) (2017)

(defining "basic work activities"). Because this "is a threshold question with a de minimis

severity requirement," *Felton-Miller*, 459 F. App'x at 230, the ALJ's step-two analysis "requires

a careful evaluation of the [objective] medical findings that describe the impairment(s) and an

informed judgment about the limitations and restrictions the impairment(s) and related

symptom(s) impose on the individual's physical and mental ability to do basic work activities.'"

SSR 96-3p, 1996 WL 374181, at *2 (July 1, 1996) (cleaned up). The ALJ may find a claimant's

medical impairment(s) to be "not severe" only when she logically explains why it is a "slight

abnormality" that has such a "minimal effect" on the claimant that it would not meaningfully

disrupt her ability to do basic work activities. *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir.

1984) (emphasis omitted); *see* SSR 96-3p, 1996 WL 374181, at *2.

A.    *Summary*

1.    *Relevant Medical Evidence*

On August 25, 2008, prior to her alleged onset date, Daphne presented to the emergency

department at Community Memorial Pavilion for a psychiatric evaluation with Masoud Hejazi,

M.D. R. 203–04. Daphne complained that she was "upset with [her] husband" after learning that

he had impregnated another woman with whom he had engaged in an extramarital affair. R. 203.

Daphne had "been feeling down in the dumps, dysphoric, moody, agitated and had [a] brief

physical confrontation with her husband." *Id.* She denied having any delusions, paranoia, or

hallucinations, but she thought she might suffer from bipolar disorder, which is what prompted

her to seek "admission to [inpatient] psychiatric services." *Id.* Dr. Hejazi noted that Daphne

looked "[d]isheveled, unkempt," and "older than her chronological age," was "extremely

dysphoric and sad," and "seem[ed] bewildered and overwhelmed by her relationship with her

husband." *Id.* Daphne's speech was coherent and appropriate, her "frame of thought and thought

content were intact," her intellectual "and cognitive functioning seem[ed] to be around average,"

and she was "not psychotic." *Id.* Dr. Hejazi diagnosed Daphne as follows: (1) major depressive

disorder recurrent, severe; (2) bipolar disorder, NOS (provisional); and (3) alcohol dependence

vs. abuse. R. 203–04. For treatment, Dr. Hejazi ordered that Daphne be admitted to Pavilion "to

participate in milieu therapy" for five to seven days and noted that "medication management will

be implemented" and followed on an outpatient basis. R. 204.

Daphne was discharged from Pavilion on August 30, 2008, and Veeraindar Goli, M.D.,

filed her discharge report. R. 205–07. Dr. Goli noted that Daphne "reportedly has significant

mood swings that they believe has been untreated bipolar disorder and she reportedly drinks

much more heavily just before a manic or hypomanic 'energy burst.'" R. 206. At her discharge,

Daphne "remained somewhat disheveled, looking older than her chronological age," but she

exhibited "good eye contact," a "cooperative attitude," fluent speech, "fair" insight and

judgment, and an "intact" memory with no signs of confusion. *Id.* Daphne "denied depression

and stated that she was calm although at times during the conversation she was irritable." *Id.* She

also "remained quite distracted about the relationship with her husband." *Id.* Dr. Goli instructed

Daphne to continue her Cymbalta and Seroquel and to consider "intensive one to one counseling

perhaps as often as twice weekly to start." R. 207. Her prognosis was "guarded." *Id.*

On December 7, 2010, Daphne visited with her primary care physician William Jones,

M.D., "complaining of a pounding in her head and fatigue." R. 234. Daphne was uncertain what

caused her issues, but she told Dr. Jones that her "tumultuous divorce . . . caused her much

distress." *Id.* Daphne felt "like she probably need[ed] to get back on Cymbalta which she took in

the past for depression," and Dr. Jones ordered her to resume Cymbalta. *Id.* Aside from the

treatment records from Pavilion and Dr. Jones, the record is scarce on pre-DLI documentation of

Daphne's mental health impairments. *See, e.g.*, R. 222 ("Mental Status – Affect is

appr[o]priate") (Dec. 2011) (Ex. 3F/7); R. 228 (same) (Oct. 2011) (Ex. 3F/13); R. 233 ("Alert,

pleasant, no distress") (Aug. 2011) (Ex. 3F/18); R. 236 ("[A]lert and smiling") (July 2010) (Ex.

3F/21).

After her DLI, Daphne visited with Dr. Russell for a consultative psychological

evaluation on November 1, 2012. R. 249–54. Daphne reported that she last worked "in 2008 or

7

2009 before 'my last breakdown,'" and that she had not worked since that time because, "I just can't deal with it. It's too much." R. 250. When asked about mental health treatment, Daphne "said she is supposed to be on Cymbalta and some other type of medication but she said she cannot afford it," and that "she has been hospitalized three times for depression and suicidal ideation." *Id.* Dr. Russell noted, "she indicated she has not quite been the same since the dissolution of her last marriage and also her mother died about the same time." R. 251. When asked about friends she sees regularly, Daphne said she "[does not] care . . . about friends" and "said there is nothing that she currently enjoys or finds pleasure in." R. 251. When asked how often she experienced crying spells, Daphne said she has them "[s]ometimes every day, then it's every other day . . . . [s]ince I split up with my husband and my mommy died." R. 252. When asked why she was unable to obtain or maintain employment, Daphne responded, "[t]he truth is I don't want to go anywhere or be around anyone." R. 253. On exam, Dr. Russell found that Daphne was cooperative, seemed to give her best effort, and related "in a matter of fact and business-like fashion" without exhibiting signs of evasiveness, suspiciousness, distractibility, or hostility. R. 251. She had a "restricted" affect and "depressed" mood, *id.*, and she "started to get upset" and "appeared in some minor distress" when asked about past homicidal ideation, R. 252. Her memory was "fair" to "good," her judgment and insight were "fair," and her "[a]bstract reasoning ability was poor." R. 252–53. Dr. Russell opined that Daphne gave fairly reliable information "with no evidence of malingering." R. 253.

Based on his exam findings, Dr. Russell opined that Daphne "most likely has the intellectual ability to perform detailed and complex tasks, but due to her depressed mood, difficulty concentrating, and preoccupation with her own misery, it is unlikely that she would be able to perform such tasks consistently. She would even have difficulty performing simple

repetitive tasks, maintaining regular attendance in the workplace and performing work activities

on a consistent basis." *Id.* Dr. Russell also noted that Daphne "appear[ed] fully capable of

accepting instructions from supervisors and interacting with coworkers and with the public." *Id.*

In the diagnostic rationale portion of the report, Dr. Russell stated that he "suspects with some

mental health treatment [Daphne's] depressed mood can improve," but that "her depressed mood

and her preoccupation with her own misery precludes her from being able to focus long enough

to perform anything but the most menial tasks." *Id.*

DDS psychologists Jo McClain, Psy.D., and Leslie Montgomery, Ph.D., reviewed

Daphne's medical records in March 2018 and June 2018, respectively. *See* R. 84–88, 96–99. In

March, Dr. McClain opined that Daphne had "severe" medically determinable impairments of

"Depressive, Bipolar and Related Disorders" and "Substance Addiction Disorders (Alcohol)"

before her insured status expired on December 31, 2011. *See* R. 87. Nonetheless, Dr. McClain

concluded there was "insufficient evidence in [the] file to fully evaluate" Daphne's mental

impairments prior to that date because her record contained "no functional information or

detailed mental status exams" dated after December 2010. *See* R. 86–87. Dr. Montgomery

generally agreed with Dr. McClain's assessment after reviewing Daphne's records in June 2018.

*See* R. 98 (finding "severe" impairment of "Depressive, Bipolar and Related Disorders," but

concluding there was "insufficient evidence in [the] file to fully evaluate [Daphne's] mental

impairments prior to 12/31/2011 DLI. There is no functional information or detailed mental

status exams."). Unlike Dr. McClain, however, Dr. Montgomery specifically considered Dr.

Russell's medical opinion that Daphne's "depressed mood and her preoccupation with her own

misery preclude[d] her from being able to focus long enough to perform anything but the most

menial tasks," and that there "appear[ed] to be some evidence of [Daphne's] fragility even prior

9

to [her] last divorce" in 2009–2010. R. 95 (citing R. 253). Dr. Montgomery found that Dr.

Russell's "opinion [was] supported by medically acceptable clinical and laboratory diagnostic

techniques, and [was] consistent with other evidence in the file." R. 99.

       2.        *Daphne's Statements*

Daphne completed a Disability Report in January 2018. R. 157–64. She stated that she

suffered from mental impairments and strokes and that she had stopped working January 1, 2011

because of her conditions. R. 158. Daphne also testified at the hearing before ALJ Knight in July

2019. R. 28–41. Asked why she could not work in 2011, Daphne said that "something really bad

happen[ed]" to her in 2009–2010 and that she "just couldn't deal with" working full time

anymore. R. 36 ("I had always worked two jobs all my whole life and then this happened and I

just couldn't deal with it."). She explained, "I just couldn't concentrate, I couldn't deal with the

public . . . . I didn't want to go out of the house." *Id.* Daphne initially got "medicines and help

from the psychiatric place" after the "traumatic event." R. 37. She did not see a mental health

professional in 2011, *see* R. 37–38, but she did take antidepressants prescribed first by providers

at "the Southside mental facility, and then [by her] regular doctor," R. 40. Daphne did not have

health insurance at the time. R. 41. Asked to describe a typical day in 2011, Daphne said, "I

would get up and fix coffee and just watch television, and maybe do some dishes or something

like that until time to go to bed, that's about it." R. 38. She further testified that she did some

cooking, cleaning, and laundry during 2011 and that her son paid her bills and visited her at

home. R. 38–39. Daphne left her house at most "two or three times a week," usually "just to [go

to] the grocery store." R. 33; *see* R. 39. She did not go out to visit friends or family, engage in

any social activities like going to church, or have any hobbies. R. 39.

B.      *The ALJ's Decision*

At step one, ALJ Knight determined that Daphne "did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2011 through her date last insured of December 31, 2011." R. 17. ALJ Knight then found that Daphne suffered from the medically determinable impairments of hypertension, obesity, depression, and bipolar disorder. *Id.* Nevertheless, she determined that through her date last insured, Daphne "did not have an impairment or combination of impairments that significantly limited [her] ability to perform basic work-related activities for 12 consecutive months," and thus did not have a severe impairment or combination of impairments. *Id.*

In making this determination, ALJ Knight summarized Daphne's testimony that "she was disabled because she couldn't concentrate, deal with the public and didn't want to leave her house" after having "a bad experience in 2009 and 2010." R. 18 ("She was depressed, and symptoms included not wanting to leave her home and not wanting to be around others."). ALJ Knight found that Daphne's "medically determinable impairments could have been reasonably expected to produce the alleged symptoms; however, [Daphne's] statements about the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence." R. 18–19.  Discussing Daphne's mental impairments, she found that Daphne's "clinicians regularly noted a bright and appropriate affect at routine office visits, and did not note that [Daphne] had any deficits in concentration, attention, memory, social ability or regulating herself." R. 19 (citing R. 228, 233, 236); *see also* R. 20 (finding that Daphne's record contained no "mention of any issues with [her] short- or long-term memory" or "any mention of distractibility").

ALJ Knight then concluded that "the record fails to corroborate the extent of the limitations [Daphne] advances." *Id.* She found Daphne's testimony inconsistent, noting that

11

Daphne claimed to have trouble socializing and leaving her home, "but she drove herself to the

grocery store a couple of times per week and socialized with her son, both of which imply an

ability to leave the house and sustain a level of social interaction." *Id.* She also noted that

Daphne "was able to cook, clean, take care of her personal needs independently, manage her

finances, and read and watch television, all of which require a level of sustained attention and

concentration." *Id.* Thus, she concluded that "the objective findings in the record, the

conservative care [Daphne] has received, and her admitted ability to perform a variety of daily

tasks all suggest that these symptoms did not impose more than a minimal effect on her ability to

perform work-related activities, and are not as severe as she claims." R. 19–20.

ALJ Knight then considered the four broad areas of mental functioning in § 12.00B of the

Listing of Impairments, 20 C.F.R., Part 404, Subpart P, Appendix 1, also known as the

"paragraph B" criteria. R. 20. She found that Daphne's depression and bipolar disorder, R. 17,

caused "no limitations" in her abilities to understand, remember, or apply information and to

adapt or manage herself, and "mild limitations" in her abilities to interact with others and to

concentrate, persist, or maintain pace, R. 20. ALJ Knight rejected Daphne's allegations that she

had "difficulties" or "limitations" in these functional areas as inconsistent with her testimony that

she "could prepare meals, pay bills, shop, drive, and read," spend time with family and friends,

and watch television. *Id.* She also found that "the medical evidence" showed Daphne "had a

good rapport with providers, was described as pleasant and cooperative, had good interactions

with non-medical staff," and had "no problems with temper control." *Id.*

Lastly, ALJ Knight considered the opinions of the DDS medical evaluators. R. 20–21.

She observed that four different doctors had reviewed Daphne's records and opined that there

was insufficient evidence on which to base an opinion. R. 20. ALJ Knight, noting that new

evidence had been received since those opinions were issued, concluded that "[t]he record now

contains sufficient evidence upon which to base a functional assessment"—namely that

Daphne's mental impairments "did not impose more than a minimal effect on her [functional]

ability to perform work-related activities" before her DLI. *Id.* As such, she found the opinions of

the DDS medical evaluators to be unpersuasive. *Id.* ALJ Knight did not mention Dr. Russell's

medical opinions from November 2012, or the DDS psychologists' opinions that Daphne had a

"severe" mental impairment before her DLI. *See id.*

C.    *Analysis*

Daphne raises two arguments regarding ALJ Knight's alleged failure to consider certain

evidence. Pl.'s Br. 4–7. First, Daphne notes that two DDS doctors found her depressive and

bipolar disorders were severe "without reliance on any post-DLI material." *Id.* at 5. She contends

that the ALJ had an obligation not only to consider the doctors' statements regarding the

insufficiency of the evidence, as ALJ Knight did, but also to consider their medical opinions as

to severity. *See id.* Next, Daphne asserts that ALJ Knight's failure to mention Dr. Russell's post-

DLI report requires remand. *Id.* at 6. Specifically, she contends that Dr. Russell's medical

opinion would have "'permit[ted] an inference of linkage with [Daphne's] pre-DLI condition.'"

*Id.* (quoting *Bird*, 699 F.3d at 341). Daphne's second argument is persuasive and will be

addressed first; however, because Daphne's first argument raises issues that may arise again on

remand, it is also addressed.

"Medical evaluations made after a claimant's insured status has expired are not

automatically barred from consideration and may be relevant to prove a disability arising before

the claimant's DLI." *Bird*, 699 F.3d at 340. Such "post-DLI medical evidence generally is

admissible in an SSA disability determination in such instances in which that evidence permits

an inference of linkage with the claimant's pre-DLI condition." *Id.* at 341. So long as "the record

is not so persuasive as to rule out any linkage," *Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir.

1969), between the claimant's post-DLI condition and earlier symptoms, "retrospective

consideration of [post-DLI] evidence is appropriate." *Bird*, 699 F.3d at 341. Indeed, "evidence

created after a claimant's DLI, which permits an inference of linkage between the claimant's

post-DLI state of health and her pre-DLI condition, could be the most cogent proof of a

claimant's pre-DLI disability." *Id.* (cleaned up). Further, when post-DLI evidence is

corroborated by lay evidence, "retrospective consideration of medical evidence is especially

appropriate." *Id.* at 342.

ALJ Knight's failure to mention Dr. Russell's exam findings or medical opinion at any

point in her decision was clear legal error. Dr. Russell's report sufficiently permits an inference

of linkage between Daphne's post-DLI condition, as described in the report, and her pre-DLI

impairments. First, the report itself includes several passages suggesting a connection, or linkage,

between Daphne's condition as of the date of the evaluation and her pre-DLI condition. *See*

*generally* R. 249–54. For instance, Dr. Russell asked Daphne about her marital history, to which

she responded that "she has not quite been the same since the break up of her second marriage."

R. 250. Daphne also told Dr. Russell of her past hospitalizations for depression and suicidal

ideation and discussed experiencing crying spells "[s]ince I split up with my husband and my

mommy died." R. 250–51. Dr. Russell believed these statements to be credible, noting that "[t]he

reliability of the information provided by [Daphne] is fair with no evidence of malingering." R.

253. He additionally noted in his diagnostic rationale that "[t]here appears to some evidence of

her fragility even prior to the last divorce," R. 253, which occurred in 2009 or 2010. These

14

statements give rise to a potential inference that Daphne's post-DLI condition in November 2012 represented a continuation or progression of symptoms that began years earlier.

This case lies between the Fourth Circuit's decisions in *Bird v. Commissioner*, 699 F.3d 337, and *Johnson v. Barnhart*, 434 F.3d 650. In *Bird*, the Fourth Circuit reversed the district court's decision affirming the ALJ's denial of benefits. 699 F.3d at 342 ("The ALJ's failure to give retrospective consideration to the above-stated medical evidence created after Bird's DLI was an error of law, which requires reversal."). There, the ALJ failed to retrospectively consider a Veteran's Affairs disability rating and a report by an examining psychologist when evaluating Bird's claim for benefits based on post-traumatic stress disorder ("PTSD"). *Id.* at 339–40 (noting the ALJ's findings that "although Bird suffered from PTSD before his DLI, his impairment was insufficiently severe to qualify him for Social Security disability benefits"). The Fourth Circuit held that such evidence should have been considered, reasoning that it "summarized evidence that Bird suffered from severe symptoms of PTSD . . . before his DLI," and that "their substance related to Bird's history of impairments." *Id.* at 341.

On the contrary, the *Johnson* Court held that an ALJ had not erred by disregarding post-DLI evidence where it was "submitted almost nine months after [the claimant's] last insured date, . . . [the claimant made] no argument that the disabilities contained in the [post-DLI] assessment existed continuously from [before the claimant's DLI] to the present, and there is no objective medical evidence that the impairments observed by [the physician] existed prior" to the claimant's DLI. 434 F.3d at 656. There, the evidence at issue was a post-DLI assessment by the claimant's primary care physician that "inexplicably conflicted" with earlier assessments by the same physician. *Id.* at 655.

15

The evidence at issue in the instant case—Dr. Russell's report—more closely resembles that at issue in *Bird.* As discussed above, there are several factors linking Dr. Russell's post-DLI report to Daphne's pre-DLI impairments. Further, unlike the report in *Johnson*, Dr. Russell's report does not conflict with other medical opinions, whether his own or from any other acceptable medical source. *See, e.g.*, R. 99 (Dr. Montgomery opining that Dr. Russell's medical opinion was "supported by medically acceptable clinical . . . techniques" and "consistent with other evidence in [the] file," and was not "more restrictive" than her own findings about Daphne's "abilities and limitations"). Indeed, viewing the record as a whole, one could conclude that Daphne's state upon visiting Dr. Russell in November 2012 resulted from continuing and progressing mental disorders. *See* R. 36–37, 203–05, 234. She had been diagnosed with depression and bipolar disorder as early as 2008, often stated that her problems arose around the time that she divorced her husband and lost her mother, and the record does not conclusively show that her issues ceased or improved prior to Dr. Russell's report. R. 36–37, 203–05, 234. She also stated that she could not afford the mental health treatment that Dr. Russell thought might improve her functioning. R. 250; *see also* R. 41. Thus, whereas the report in *Johnson* was contradicted by the objective medical evidence, Dr. Russell's report finds some support in the minimal evidence in the record here. *See* R. 203–05, 234. Further, Daphne, unlike the *Johnson* claimant, expressly asserts that her condition was continuous, claiming it began years earlier. R. 36.

Thus, the ALJ should have considered Dr. Russell's report as "the record is not so persuasive as to rule out any linkage." *Moore*, 418 F.2d at 1226. ALJ Knight's failure to consider it deprived Daphne of the potential favorable inferences that can logically be drawn from it, *see id.* ("This circumscription of inferences was harmful to the claimant."), particularly given that

16

step two "is a threshold question with a de minimis severity requirement," *Felton-Miller*, 459 F.

App'x at 230. *See Evans*, 734 F.2d at 1014; *Arrington v. Colvin*, No. 4:13cv11, 2014 WL

2586237, at *7 (W.D. Va. June 10, 2014) (noting that step two sets a "relatively low bar" and

concluding that substantial evidence did not support ALJ's finding that claimant's anxiety was

non-severe where claimant "had a diagnosed anxiety disorder, took several prescription anti-

anxiety medications, was under a physician's care for many years, and sought psychiatric help on

more than one occasion"). As such, it was legal error for ALJ Knight to disregard Dr. Russell's

report and remand is warranted. *Bird*, 699 F.3d at 342.

Although remand is necessary based on the ALJ's lack of consideration of Dr. Russell's

report, the Court will also address Daphne's first argument to avoid similar issues arising on

remand. Daphne asserts that ALJ Knight erred by failing to consider the two DDS consultants'

medical opinions that Daphne's impairments were severe because "[a]n ALJ is required to

evaluate 'every medical opinion'" in the record. Pl.'s Br. 6 (quoting *Brown v. Comm'r Soc. Sec.*,

873 F.3d 251, 271 (4th Cir. 2017)).

The Court first observes that ALJ Knight appears to have considered, at least to some

degree, the opinions of these reviewing psychologists. *See* R. 20–21. She states that each of the

DDS psychologists opined "that the record contains insufficient evidence upon which to base an

opinion." *Id.* She also noted that "[n]ew evidence has been received since these DDS doctors

submitted their opinions," found the opinions were unpersuasive, and determined that, with the

new evidence, "[t]he record now contains sufficient evidence upon which to base a functional

assessment." R. 21. Nevertheless, as Daphne correctly notes, ALJ Knight did not specifically

address the DDS psychologists' opinions that Daphne's impairments were "severe" before her

DLI. *See* R. 20–21, 87, 98.

17

In finding that Daphne did not have a severe impairment, the ALJ reached a different conclusion that the DDS psychologists, but she did not explain why. "It is the duty of the ALJ to make findings of fact and resolve conflicts in the evidence." *Boston v. Barnhart*, 332 F. Supp. 2d 879, 890 (D. Md. 2004). Where relevant evidence contradicts the ALJ's conclusion, the ALJ should explain how and why the conflict was resolved in the way that it was. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 764 (W.D. Va. 2002) ("[I]f the ALJ appears, without stating a reason, to have credited some probative evidence over other evidence or to have ignored evidence altogether, a remand or reversal may be necessary.").

Here, the DDS psychologists' severity findings are plainly at odds with ALJ Knight's conclusion that Daphne did not have a severe impairment during the relevant period. Because of ALJ Knight's failure to address relevant evidence—the DDS psychologists' medical opinions as well as Dr. Russell's report, her determination that Daphne did not suffer from a severe impairment does not withstand scrutiny and requires remand. On remand, ALJ Knight should consider Dr. Russell's report and reconcile the conflict between her conclusion that Daphne's impairments were not severe and the conclusion of the DDS psychologists that they were.

* * *

I take no position on whether Daphne is entitled to disability benefits for the relevant period. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record and explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Daphne's Motion for Summary Judgment, ECF No. 15, **DENY** the Commissioner's

Motion for Summary Judgment, ECF No. 17, **REVERSE** the Commissioner's final decision,

**REMAND** the case for further administrative proceedings under the fourth sentence of 42

U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within

14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel

of record.

ENTER: December 9, 2021

Joel C. Hoppe
U.S. Magistrate Judge

19